# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| IMPERIAL DADE CANADA INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2024-0916-MTZ |
| | ) | |
| VERITIV OPERATING COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

WHEREAS:

A.    On May 2, 2022 (the "Closing Date"), Veritiv Corporation sold its Canadian subsidiary Veritiv Canada, Inc. ("Veritiv Canada") to plaintiff Imperial Dade Canada, Inc. ("Imperial") pursuant to a stock purchase agreement (the "SPA").[1]  In SPA Section 8.9(a)(i), Veritiv Corporation's U.S. subsidiary Veritiv Operating Company ("Veritiv US") agreed not to compete in Canada for five years the "Noncompete").  The Noncompete reads:

> For a period of five (5) years immediately following the Closing Date, [Veritiv US] shall not, and [Veritiv US] shall cause [its] controlled Affiliates not to, directly or indirectly . . . anywhere within Canada . . . own, operate, control, manage, or otherwise engage in any business or activity that competes with the Business . . . .[2]

---

[1] D.I. 47 Ex. 1.

[2] *Id.* § 8.9(a)(i).

1

B.      The SPA also prohibits Veritiv US from taking "any action that is intended to circumvent any provision of this Section 8.9(a)."[3]

C.      The SPA defines "Business" as "the business of distributing food process and foodservice packaging, shipping and protective packaging, commercial printing and facility supply products within Canada."[4]

D.      Under the SPA, "Affiliate" means,

> with respect to any specified Person, any other Person which directly or indirectly controls, is controlled by or is under common control with such specified Person.  For purposes of this definition, 'control,' when used with respect to any specified Person, means the power to direct or cause the direction of the management and policies of such Person, directly or indirectly, whether through ownership of voting securities or equity or ownership interests or by contract, credit arrangement or otherwise; and the terms 'controlling' and 'controlled' have meanings correlative to the foregoing.[5]

E.      Veritiv Publishing & Print Management, Inc., d/b/a Bulkley Dunton ("Bulkley Dunton") is a controlled Affiliate of Veritiv US.[6]

F.      Section 8.9(a)(ii) carves out exceptions to the Noncompete.[7]  Relevant here, Section 8.9(a)(ii)(C)(2) permits Veritiv US to

> continue to sell packaging products to . . . any current or future customer of [Veritiv US] based in the United States of America that

---

[3] *Id.* § 8.9(a)(iv).

[4] *Id.* § 1.1.

[5] *Id.* § 1.1.

[6] D.I. 48 Ex. 24 at 8.

[7] D.I. 47 Ex. 6 § 3; *see also* D.I. 47 Ex. 1 § 8.9(a)(ii).

requests on its own, without any solicitation, bid, pitch, proposal, inducement or similar action by [Veritiv US] or any of its controlled Affiliates, that [Veritiv US] supply packaging products to such U.S. Customer at such U.S. Customer's locations in Canada (such current or future customer, a "U.S. Customer"); provided, that, with respect to sales of such products at any time during the five (5) years immediately following the Closing Date, prior to [Veritiv US] accepting or fulfilling any request for any sale of such products, Seller shall notify the Company in writing of the storage, handling and delivery terms applicable to such products (a "Bid Request") and the customer for whom such storage, handling and delivery services are being requested (the "3PL Services") and Buyer shall be permitted to submit a proposal to Seller within three (3) Business Days after receipt of the Bid Request to provide such 3PL Services (a "Bid Response"). If Buyer's terms for providing the 3PL Services in the applicable Bid Response are, in the aggregate, equal to or better than those offered on an arm's-length basis by other available third-party providers, [Veritiv US] shall obtain the 3PL Services from Buyer for such customer.[8]

G.  Imperial asserts Veritiv US violated the Noncompete with respect to nine Veritiv US or Bulkley Dunton customers.[9] Imperial discovered evidence that Veritiv US was breaching the Noncompete in January 2024 and began investigating the possibility of further breaches.[10] It contacted Veritiv US about the issue by February.[11] On September 3, Imperial filed its complaint, a motion to expedite, and a motion for a preliminary injunction to enforce the Noncompete with respect to

---

[8] D.I. 47 Ex. 6 § 3; *see also* D.I. 47 Ex. 1 § 8.9(a)(ii). The other exceptions, which are not at issue, concern product sales to the "Category 1 Person" and "Category 2 Persons" specified by the agreement. D.I. 47 Ex. 6 § 3.

[9] *See generally* D.I. 1; D.I. 47 at 13–24.

[10] D.I. 1 ¶ 39; *see also* D.I. 57 at 117–18.

[11] *See* D.I. 49 Ex. 33.

what the parties call Customers 1–9 (the "Motion").[12] I granted expedition, but denied Imperial's request to hold a preliminary injunction hearing in forty-five days, explaining "that the months Plaintiff spent investigating and conferring before bringing suit, while not undue, betray that Plaintiff is not suffering the sort of irreparable harm necessary to move this litigation and this Court on that extreme schedule."[13] The parties briefed the Motion[14] and offered oral argument on December 17.[15]

H. Veritiv US has admitted competing with some customers in Canada.[16] For others, Veritiv US asserts its sales did not breach the Noncompete either because Veritiv US itself did not ship the products into Canada, or because its sales complied with Section 8.9(a)(ii)(C)(2)'sexception to the Noncompete.[17]

I. "This Court has broad discretion to grant or deny a preliminary injunction."[18] A preliminary injunction "is not granted lightly," and "the moving party bears a considerable burden in establishing each of these necessary

---

[12] D.I. 1; D.I. 65 Ex. A. The parties adopted code names for the customers for purposes of these public proceedings. I have adopted those code names. D.I. 65 Ex. A.

[13] D.I. 14.

[14] D.I. 47; D.I. 54; D.I. 64.

[15] D.I. 83.

[16] D.I. 54 at 53–54.

[17] D.I. 48 Ex. 14 at 5–6; D.I. 54 at 52–53.

[18] *Fletcher Int'l, Ltd. v. ION Geophysical Corp.*, 2010 WL 1223782, at *3 (Del. Ch. Mar. 24, 2010).

elements."[19] To obtain a preliminary injunction, the movant must demonstrate: (i) a reasonable probability of success on the merits; (ii) a threat of irreparable injury if an injunction is not granted; and (iii) that the balance of the equities favors the issuance of an injunction.[20] A party showing a reasonable probability of success must demonstrate "that it will prove that it is more likely than not entitled to relief."[21] Irreparable harm is not present if the plaintiff's injury "is merely speculative or if the injury can be fully compensated after a full trial on the merits, either by an award of damages or by any other form of final equitable relief."[22]

J.     Restrictive covenants like the Noncompete are enforceable when they (i) are valid under general principles of law, (ii) are reasonable in their scope and effect, (iii) bear a reasonable relationship to the advancement of legitimate interests, and (iv) survive a balancing of the equities.[23] "Generally, covenants not to compete in the context of a business sale are subject to a 'less searching' inquiry than if the

---

[19] *Id.* at *3 (alterations omitted) (quoting *La. Mun. Police Empls.' Ret. Sys. v. Crawford*, 918 A.2d 1172, 1185 (Del. Ch. 2007)).

[20] *Pell v. Kill*, 135 A.3d 764, 783 (Del. Ch. 2016).

[21] *C & J Energy Servs., Inc. v. City of Miami Gen. Empls.' & Sanitation Empls.' Ret. Tr.*, 107 A.3d 1049, 1067 (Del. 2014) (quoting *Mitchell Lane Publ'rs, Inc. v. Rasemas*, 2014 WL 4925150, at *3 (Del. Ch. Sept. 30, 2014)).

[22] *Cantor Fitzgerald, L.P. v. Cantor*, 724 A.2d 571, 586 (Del. Ch. 1998) (footnote omitted).

[23] *Sunder Energy, LLC v. Jackson*, 305 A.3d 723, 746 (Del. Ch. 2023) *aff'd in part, rev'd in part on other grounds*, 2024 WL 5052887 (Del. Dec. 10, 2024).

covenant 'had been contained in an employment contract.'"[24] "A non-competition agreement will only be enforced to protect the legitimate economic interests of the employer. Interests which the law has recognized as legitimate include protection of employer goodwill and protection of employer confidential information from misuse."[25]

**IT IS HEREBY ORDERED** this 29th day of January, 2025:

1. The Noncompete was validly executed between two businesses in connection with the sale of a company.[26] Its purpose is "to protect the value and goodwill of the Business and the substantial investment made by [Imperial]."[27] Imperial purchased goodwill in the Canadian paper and packaging market, and has a legitimate business interest in protecting that goodwill. The Noncompete's scope, as circumscribed by the definition of Business, is properly limited to that market.[28]

   a. Veritiv US argues the Noncompete is unreasonable and overbroad because it restricts Veritiv US's ability to service U.S.-based customers

---

[24] *Kodiak Bldg. P'rs, LLC v. Adams*, 2022 WL 5240507, at *4 (Del. Ch. Oct. 6, 2022) (citing *Tristate Courier & Carriage, Inc. v. Berryman*, 2004 WL 835886, at *10 (Del. Ch. Apr. 15, 2004)).

[25] *Rsch. & Trading Corp. v. Pfuhl*, 1992 WL 345465, at *12 (Del. Ch. Nov. 18, 1992).

[26] *See generally* D.I. 47 Ex. 1.

[27] *Id.* § 8.9.

[28] *See id.* § 1.1.

at their locations in Canada.[29]  It contends Veritiv Canada was "only capable of distributing certain products from one Canadian location to another" and therefore could not have competed for the business of U.S.-based customers with products sourced from outside Canada.[30]  The record shows this is not so.  Referencing a non-Canadian paper company, Veritiv Canada's former sales manager stated, "Prior to the acquisition, I personally dealt with [company] employees located in Boston, Massachusetts (its corporate headquarters) and in the Netherlands.  I personally negotiated contracts on behalf of Veritiv Canada with [the company's] employees."[31]  He further stated, "[M]y colleagues at Veritiv Canada visited [the company's] Boston office in 2019 and subsequently met with [company] employees at other locations outside of Canada for business purposes."[32]  Veritiv US also produced a spreadsheet titled "Sales by Customers Compressed for Veritiv Canada," which indicates that Customer 3, a U.S-based customer, was a Veritiv Canada customer before the acquisition.[33]  This evidence suggests Imperial has a legitimate

---

[29] D.I. 54 at 39, 44–46.

[30] *Id.* at 44–45.

[31] D.I. 64, Doucet Aff. ¶ 5.

[32] *Id.*

[33] *See* D.I. 61 Ex. U (listing Customer 3 in row 4697); D.I. 58 Aff.; D.I. 48 Ex. 9 at 10 (identifying Customer 3 as U.S.-based).

business interest in Veritiv's relationships with U.S.-based customers seeking goods in Canada.

b.      And the Noncompete does not prohibit Veritiv US from distributing products to U.S.-based customers in Canada.  Section 8.9(a)(ii)(C)(2) allows Veritiv US to do so as long as Veritiv US follows certain procedures, including allowing Imperial to match the 3PL terms those customers requested.[34] This carveout trims the Noncompete's scope to fit Veritiv Canada's cross-border business.

2.      Next, Veritiv US argues its sales to Customers 1–8 were permitted under Section 8.9(a)(ii)(C)(2) as unsolicited sales to U.S-based customers.[35]  Section 8.9(a)(ii)(C)(2)'s plain text allows Veritiv US to supply packaging products to a U.S.-based customer at its Canadian locations as long as the customer requests the products without solicitation and Veritiv US follows certain procedures.[36]  Veritiv US must notify Imperial of the order's 3PL terms and allow Imperial to match those 3PL terms.[37]  Veritiv US did not provide Imperial notice of the 3PL terms and an opportunity to bid for any of Customers 1–8.[38]  Veritiv contends that for U.S.-based

---

[34] D.I. 47 Ex. 6 § 3.

[35] D.I. 54 at 49–54.

[36] D.I. 47 Ex. 6 § 3.

[37] *Id.*

[38] Certain sales to Customer 1 also fail to qualify for Section 8.9(a)(ii)(C)(2) because Customer 1 picked up the products in the U.S.  D.I. 49 Ex. 59 at 128–29; D.I. 48 Ex. 11.

8

customers who requested packaging products within Canada without soliciting 3PL Services, Veritiv can supply such products without notifying Imperial as long as those customers can be served via zero-cost-to-customer direct shipments.[39] Section 8.9(a)(ii)(C)(2)'s plain text makes no such distinction.

3.  From there, I consider in turn whether Veritiv US's sales to each customer breached the Noncompete. The Motion is **GRANTED** as to Customer 1.

a.  Nine purchase orders dated from July 18, 2022, to May 28, 2024, show Veritiv US sold packaging products to Customer 1's Canadian operation.[40] For six of those orders, the evidence shows Customer 1's carrier picked up the products from Veritiv US in the U.S. before taking the products to Canada.[41] In its Answer, Veritiv US admits it competed with the Business with respect to Customer 1 while denying wrongdoing.[42]

b.  Shipments from Veritiv US to Customer 1's Canadian location plainly compete with the Business within Canada in violation of the Noncompete.

---

In such instances, Veritiv US did not supply the products to Customer 1's Canadian location as required under the exception. The sales to Customer 7 also fail to qualify because Customer 7 ordered commercial printing products, not packaging products. D.I. 48 Ex. 17 at PDF Page 13.

[39] D.I. 54 at 49–54.

[40] D.I. 48 Ex. 11.

[41] D.I. 49 Ex. 59 at 128–29; *see id.* at 2; D.I. 48 Ex. 11; *see also* D.I. 54 at 30 ("[Customer 1] ordered products from [Customer 1's] Canadian location but picked those items up from Veritiv's U.S. warehouse and took the products into Canada on its own.").

[42] D.I. 16 ¶ 47(c).

So does selling packaging products to Customer 1's Canadian operation, even though the customer picks up the products in the U.S. to bring them into Canada.

       c.     Veritiv US's sales to Customer 1—which have persisted into 2024—threaten irreparable harm to Imperial's ability to capitalize on the goodwill it bought when it purchased Veritiv Canada.  The market at issue involves fungible, indistinguishable products, and Imperial is a new entrant.[43]  As such, vendor and customer relationships are crucial to Imperial's future success,[44] and the value of maintaining those relationships would be difficult to quantify.[45]

       d.     As to the balance of the equities, the preliminary injunction enforces a heavily negotiated contract between sophisticated parties.  Imperial paid handsomely for Veritiv Canada's customer base and goodwill.[46]  There is no inequity in holding Veritiv US to its deal.

    4.     The Motion is **DENIED** as to Customers 2 and 3.

       a.     As to Customer 2:  two invoices dated August 15, 2022, and December 7, 2022, show Veritiv US distributed packaging products to Customer 2

---

[43] D.I. 49 Ex. 58 at 27, 76–77.

[44] *See id.* at 31–32 (testifying paper was a new area of Business for Imperial); *id.* at 36–37 (testifying to the value of long-term vendor-customer relationships); D.I. 49 Ex. 56 at 153–55 (testifying to the importance of reputation in the paper industry); D.I. 49 Ex. 57 at 163–65 (testifying to the value of relationships in the business of selling packaging products).

[45] *See* D.I. 49 Ex. 52 at 23.

[46] *See* D.I. 47 Ex. 1 § 2.2.

in Canada.[47]  In its Answer, Veritiv US admits it competed with the Business with respect to Customer 2, while denying wrongdoing.[48]

        b.     As to Customer 3:  one invoice dated May 10, 2022, shows Veritiv US distributed packaging products to Customer 3 in Canada.[49]  In its Answer, Veritiv US admits it competed with the Business with respect to Customer 3, while denying wrongdoing.[50]

        c.     Imperial's evidence of isolated distributions from 2022 does not demonstrate irreparable harm on a go-forward basis—the sine qua non of injunctive relief.[51]  Veritiv US has stated it is willing to resolve the issues through "appropriate remuneration."[52]

5.     The Motion is **GRANTED** as to Customers 4 and 5.

        a.     Customers 4 and 5 are both U.S.-based customers who placed orders with Veritiv US, which shipped the products to a different entity in Canada.

        b.     As to Customer 4:  five invoices dated from November 1, 2022, to September 22, 2023, show Veritiv US sold packaging products to a Customer 4

---

[47] D.I. 48 Ex. 12.

[48] D.I. 16 ¶ 47(c).

[49] D.I. 48 Ex. 13.

[50] D.I. 16 ¶ 47(c).

[51] *See Kingsbridge Cap. Gp. v. Dunkin' Donuts Inc.*, 1989 WL 89449, at *4 (Del. Ch. Aug. 7, 1989); *Nebeker v. Berg*, 115 A. 310, 311 (Del. Ch. 1921).

[52] D.I. 54 at 53–54.

entity in New York, but shipped the products to a different Customer 4 entity in Canada.[53]

c.      As to Customer 5:  seven invoices dated from November 2, 2022, to August 7, 2024, show Veritiv US sold packaging products to a Customer 5 entity in New York, but shipped the products to a different Customer 5 entity in Canada.[54]

d.      Imperial has demonstrated likely success in proving Veritiv US directly competed with the Business in Canada by shipping packaging products for Customers 4 and 5 within Canada.  Multiple Veritiv US invoices show orders placed by Customers 4 and 5 that Veritiv US shipped to Canada.

e.      Veritiv US contends that Customer 4 and Customer 5, based in New York, "consigned those Restricted Products to [an entity] located in Lachine, Canada.  Veritiv [US] was not the exporter of the Restricted Products to Canada and did not import those Restricted Products into Canada."[55]  Indeed, an October 3, 2022, "Canada Customs Invoice" lists the Customer 5 entity in New York as the purchaser

---

[53] D.I. 48 Ex. 15.

[54] D.I. 48 Ex. 16.

[55] D.I. 48 Ex. 14 at 5.  The entity listed in this interrogatory response appears in the list of entities for both Customer 4 and Customer 5.

Veritiv US also argues these sales were permitted under Section 8.9(a)(ii)(C)(2). *See* D.I. 54 at 53.  I have explained above why this is not so.

12

and the Customer 5 entity in Canada as the consignee.[56]  It identifies another U.S. company as the exporter.[57]

  f. But the customs invoice reflecting consignment also shows Veritiv US is the vendor and originator of packaging products exported to Canada from the U.S., and the invoice includes contact information for a Veritiv US employee and Veritiv's global trade compliance department.[58]  So Veritiv US was likely involved, at least indirectly, in distributing competing products to Customer 5 within Canada.  And numerous other invoices show Veritiv US shipped products to Customer 5 in Canada, activity that plainly competes with the Business.

  g. As to irreparable harm, the sales to Customers 4 and 5 were to customers whose goodwill Imperial purchased, and they continued into 2023 and 2024.  As with the sales to Customer 1, the balance of equities favors enforcing the Noncompete Veritiv US agreed to.

6. The Motion is **GRANTED** as to Customer 6.

  a. Imperial discovered a "Canada Customs Invoice" dated August 3, 2022, listing Veritiv US as the vendor and originator of packaging products exported to Canada from the U.S.[59]  As with the Customer 5 customs invoice, it

---

[56] D.I. 48 Ex. 17 at PDF page 9.

[57] *Id.*

[58] *Id.*

[59] *Id.* at PDF page 1, 11.

includes contact information for a Veritiv US employee and Veritiv's global trade compliance department.[60] It lists a Customer 6 entity in Illinois as the purchaser and a Customer 6 entity in Canada as the consignee. It identifies another U.S. company as the exporter.[61]

        b.       Veritiv US stated in an interrogatory response that "it Sold products to . . . [a Customer 6 entity in Illinois] on or about August 3, 2022. [The Illinois entity] consigned those products to [a Customer 6 entity in Canada]. Veritiv [US] was not the exporter of the products to Canada and did not import those products into Canada."[62] Veritiv US would not produce additional documentation of the Customer 6 sale because the Illinois entity was not listed in Imperial's complaint.[63] As with Customer 5, Veritiv US's vendor and originator status on the Customer 6 customs invoice, and the inclusion of contact information for a Veritiv US employee and Veritiv's global trade compliance department, tend to show Veritiv US was likely involved, at least indirectly, in distributing packaging products to Customer 6 in Canada. Customer 6's purported "consignment" to Canada does not dislodge the conclusion that Veritiv US arranged to ship goods to Customer 6 in

---

[60] *Id.* at PDF page 11.

[61] *Id.*

[62] D.I. 48 Ex. 14 at 5.

[63] *Id.*

14

Canada, thereby competing with the Business in Canada. Imperial has demonstrated a likelihood of success on the merits.

c. While this invoice represents an isolated incident from 2022, Veritiv US would not produce any additional documentation regarding Customer 6 that could indicate whether similar dealings with Customer 6 have occurred since. Against that backdrop, the invoice Imperial discovered demonstrates the threat of irreparable harm on a go-forward basis. The balance of equities also favors granting a preliminary injunction.

7. The Motion is **GRANTED** as to Customer 7.

a. An electronic order confirmation dated January 3, 2023, shows Veritiv US sold and shipped commercial printing products to Customer 7 in Canada.[64] It includes a product identified as "UFREIGHT" with the description "VERITIV TO PAY FREIGHT."[65]

b. Imperial discovered this invoice on its own; only then did Veritiv US address Customer 7 in discovery.[66] Veritiv US stated in an interrogatory response that its "publishing business sold products on or about January 3, 2023, to . . . [Customer 7], based upon directed buy business that Veritiv [US]'s publishing

---

[64] D.I. 48 Ex. 17 at PDF Page 13.

[65] *Id.*

[66] *See id.* at PDF Page 1, 13; D.I. 48 Ex. 14 at 6; *see also* D.I. 16 ¶ 47(g).

business has with its customer, [an LLC], that has [a well-known corporation] as one of its members. [Customer 7] is located in Stouffville, Ontario. [Customer 7] had the products sold by Veritiv [US] shipped to [an entity] located in Markham, Ontario."[67] Veritiv US's brief presses that the well-known corporation facilitated the sale and that Customer 7 "ultimately had those products delivered" to the entity in Canada.[68]

     c.    The preponderance of the evidence establishes a likelihood that Veritiv US distributed commercial printing products to Customer 7 within Canada in violation of the Noncompete. Even if the well-known corporation facilitated the sale, the January 3 invoice indicates Veritiv US shipped the products to Canada and paid the shipping costs, which constitutes business activity that competes with the Business.

     d.    In light of Veritiv US's failure to respond fully to interrogatories until Imperial presented evidence bringing those failures to light, I am skeptical that Veritiv's breaches of the Noncompete with respect to Customer 7 are limited to one transaction in early 2023. I therefore find Imperial has demonstrated a risk of irreparable harm. The balance of equities also favors granting a preliminary injunction. If this was a one-off transaction, an injunction poses no harm to Veritiv

---

[67] D.I. 48 Ex. 14 at 6.
[68] D.I. 54 at 29.

16

US; it merely enforces the Noncompete Veritiv US agreed to. If Veritiv US's dealings with Customer 7 are ongoing, the preliminary injunction prevents further harm to Imperial.

8.  The Motion is **GRANTED** as to Customer 8 for packaging products shipped to Customer 8 in Canada.

a.  A spreadsheet titled "Veritiv - Viper Sales Data" shows sales made under a Customer 8 account for products shipped to locations in Canada from May 2022 through September 2024.[69] In response, Veritiv US contends that under a "U.S. National Supplier and Purchase Agreement" between Veritiv US and Customer 8, the "items were to be delivered to U.S. locations."[70] Yet in its Answer, Veritiv US admits that "since May 2, 2022, [it] has been distributing foodservice packaging products to [Customer 8] and/or certain affiliated entities . . . in Canada."[71] Veritiv US's brief also "acknowledges that it delivered certain products for [Customer 8] to . . . locations in Canada"[72] and offers "appropriate

---

[69] D.I. 48 Ex. 18.

[70] D.I. 54 at 54 (citing D.I. 59 Ex. S, D.I. 59 Ex. T, and D.I. 61 Ex. Y).

[71] D.I. 16 ¶ 37.

[72] D.I. 54 at 54 (citing D.I. 48 Ex. 18).

remuneration."[73]  In response to an interrogatory, Veritiv US acknowledged its use of what it called 3PL services for Customer 8.[74]

b.    Those deliveries constitute activities that compete with the Business.  The spreadsheet bears out Veritiv US's apparent admissions that it competed with the Business in Canada with respect to Customer 8.[75]  The agreement under which items "were to be delivered" to the U.S. does not negate the evidence that the items were delivered to Canada.  Veritiv US's statement that it is willing to provide remuneration for violations of the Noncompete as to Customer 8 is no substitute for injunctive relief:  its deliveries to Customer 8 in Canada have continued through 2024, presenting Imperial with the same threat of irreparable harm presented by Customers 1, 4, 5, 6, and 7.[76]  The balance of the equities again favors holding Veritiv US to its bargain; Imperial paid for Veritiv Canada's goodwill, and Veritiv US signed onto that deal.

9.    The Motion is **GRANTED** as to Customer 9.

---

[73] D.I. 54 at 54.

[74] D.I. 48 Ex. 9 at 10 ("Veritiv's sales of Restricted Products to [a specified entity] are the same as Veritiv's sales to [Customer 8] as [the specified entity] is [Customer 8's] last few miles 3PL provider.").

[75] *See* D.I. 16 ¶ 37; D.I. 54 at 54 (citing D.I. 48 Ex. 18).

[76] *See* D.I. 48 Ex. 18.

a.    A spreadsheet shows paperboard products that Bulkley Dunton, a Veritiv US controlled Affiliate, distributed to Customer 9 in Canada in 2022.[77] Veritiv US also produced a 2023 amendment to a paper supply contract between Bulkley Dunton and Customer 9.[78]  As of November 8, 2024, Bulkley Dunton and Customer 9 were in the process of negotiating a new paper supply contract.[79]  In its Answer, Veritiv US admits that "[a]fter May 2, 2022, Veritiv Bulkley Dunton has distributed commercial printing products to its customer [Customer 9] in Montreal, Canada."[80]

b.    Veritiv US argues Bulkley Dunton's sales to Customer 9 do not violate the Noncompete because Bulkley Dunton is not a paper goods or packaging company:  in the Veritiv corporate structure, Bulkley Dunton is a publishing company.  Veritiv US argues that because Section 8.9(a)(ii) is silent as to the publishing business, it does not reach publishing companies that happen to supply paper goods.[81]  But whether Bulkley Dunton is a publishing company is not relevant to Section 8.9(a)(ii):  the Noncompete's scope is circumscribed by the definition of "Business," not the sector in which the company operates.

---

[77] D.I. 48 Ex. 30; *see* D.I. 49 Ex. 56 at 109; D.I. 49 Ex. 55 at 94–96.

[78] D.I. 48 Ex. 31.

[79] *See* D.I. 48 Ex. 32.

[80] D.I. 16 ¶ 81.

[81] D.I. 54 at 46–49.

c.      From there, Veritiv US appears to argue a Noncompete including Bulkley Dunton would be unreasonable:  because publishing was not part of Veritiv Canada's business, interpreting the definition of "Business" to include Bulkley Dunton "exceeds the scope of [Imperial's] legitimate economic interest in what it purchased."[82]  Not so.  The Noncompete defines the competitive space it protects as the distribution of specified categories of products within Canada.  Imperial paid for that sector of Canadian enterprise regardless of the nature of the competitor.  And in this case, Bulkley Dunton supplies the same products to Customer 9 as Veritiv Canada distributed to its own customer before the acquisition.[83]

d.      As for irreparable harm, the evidence presented suggests Bulkley Dunton will continue to sell to Customer 9 absent injunctive relief.[84]  The balance of equities also favors granting the injunction as to Customer 9.  Veritiv US contends that if a preliminary injunction is entered, "Bulkley Dunton, which was never part of the Transaction, will have to divest pre-existing business and will be enjoined from performing its contractual commitments to its long-term customer, [Customer 9], that would result in significant liabilities."[85]  It also contends the harm to Customer 9—being forced to source its paper products elsewhere—weighs in favor

---

[82] *Id.* at 48.

[83] D.I. 56 at 147–53; D.I. 49 Ex. 55 at 100–01; D.I. 48 Ex. 30.

[84] *See* D.I. 48 Ex. 32.

[85] D.I. 54 at 62–63.

of denying the Motion.[86]  While inconvenient and not without consequences for Bulkley Dunton and Customer 9, such consequences are part and parcel of any business-sale noncompete in which the seller agrees that it and its controlled affiliates will cease doing business with pre-existing customers.  Bulkley Dunton's divestiture of its business with Customer 9 is precisely the purpose of the Noncompete.  Imperial paid for the right to attempt to earn Customer 9's business without interference from Veritiv US or its controlled Affiliates.

10.    Veritiv US makes three additional arguments against a preliminary injunction.  First, it argues monetary relief would be sufficient to remedy any breaches after a full trial on the merits.  But as explained, Imperial's lost opportunity to capitalize on Veritiv Canada's goodwill in an industry built on customer relationships, and in which Imperial is a new participant, would be difficult to quantify.[87]

11.    Second, it argues such relief would be a mandatory injunction and "would constitute final relief which could not be reversed after a final judgment because it would require Veritiv [US] to cease doing business with numerous customers, many of whom it has enjoyed long-standing relationships with that pre-

---

[86] *Id.* at 63.

[87] D.I. 49 Ex. 52 at 23; D.I. 49 Ex. 58 at 31–32, 36–37; D.I. 49 Ex. 56 at 153–155; D.I. 49 Ex. 57 at 163–165.

date the Transaction."[88]  This argument misunderstands the nature of the relief sought, which is interim, insofar as it can be lifted if Veritiv US wins at trial, and prohibitory.  The potential harm to Veritiv US's customer relationships is considered in the balancing of the equities.

12.  Finally, Veritiv US argues the doctrine of laches precludes a finding of irreparable harm.  "Generally, in order to establish a laches defense, a defendant must show:  (1) that the plaintiff had knowledge of a legal claim; (2) that the plaintiff unreasonably delayed in bringing the claim; and (3) that the defendant has suffered a resulting prejudice."[89]  Knowledge of the claim is a prerequisite to unreasonable delay.[90]  Prejudice for purposes of laches must be "the result of the [plaintiff's] unreasonable delay."[91]  Accordingly, there must be "some change in the condition or relation of the parties or the property involved in the pending lawsuit."[92]

---

[88] Veritiv US cites *Dunkin Donuts, Inc. v. O'Connor*, 1994 WL 178142, (Del Ch. Apr. 28, 1994), as a case where this Court denied a preliminary injunction that would have effectively required the defendant to stop doing business.  D.I. 54 at 55–56.  But there, a preliminary injunction would have closed down the defendant's Dunkin Donuts franchise "altogether."  1994 WL 178142, at *2 (Del Ch. Apr. 28, 1994).

[89] *Fotta v. Morgan*, 2016 WL 775032, at *10 (Del. Ch. Feb. 29, 2016).

[90] *See id.* at *12 ("Once the claimants are charged with sufficient knowledge of a potential claim, the Court must determine if the claimant's delay was reasonable.").

[91] *Id.* at *13.

[92] *Lebanon Cnty. Employees' Ret. Fund v. Collis*, 287 A.3d 1160, 1221 (Del. Ch. 2022) (citing 2 Donald J. Wolfe, Jr. & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery* § 15.07[c][4] at 15–18 (2d ed. 2021)).

a.      Veritiv US argues Imperial "has been aware of Bulkley Dunton's business with [Customer 9] in Canada since at least 2019."[93]  Veritiv US contends that five-year delay negates any argument Imperial might make that it will suffer irreparable harm.[94]  This argument is wholly meritless:  the earliest a claim for breach of the Noncompete could have arisen is 2022, when the parties signed the SPA.  And Imperial's knowledge of Bulkley Dunton's business with Customer 9 in 2019 does not imply Imperial knew Bulkley Dunton continued distributing commercial printing products to Customer 9 after the acquisition.  Without evidence to the contrary, it is fair to presume Imperial expected Veritiv US would perform under the Noncompete and cause Bulkley Dunton to cease its business with Customer 9 after the acquisition.

b.      Veritiv US next argues, "With regard to the other Identified Customers, [Imperial] claims it first became aware of Veritiv [US]'s business with [Customer 8] in January 2024, but the record reflects that [Imperial's] current president . . . was well-aware of the [Customer 8] business at the time of the Transaction."[95]  Imperial then "waited more than two years before bringing this to the fore."[96]  Again, Imperial's knowledge of Veritiv US's business with Customer 8

---

[93] D.I. 54 at 59.

[94] *Id.*

[95] *Id.*

[96] *Id.*

at the time of the acquisition does not show Imperial knew Veritiv US was breaching the Noncompete. Customer 8 is based in the U.S.,[97] so Veritiv US could have done business with Customer 8 in a manner that respected the Noncompete.[98]

c.      From there, Veritiv US argues Imperial's "delay will significantly prejudice Veritiv [US] and Bulkley Dunton should the preliminary injunction be granted by disrupting pre-existing business that was never included in the Transaction."[99]   Veritiv US points to my September order denying hyperexpedition based on Imperial's delay.[100]  But that order specified Imperial's delay was "not undue."[101]   And as explained, Bulkley Dunton's business was included in the Transaction insofar as it met the definition of "Business."

d.      Veritiv US has also not demonstrated the kind of prejudice laches requires. Here, the only prejudice Veritiv US cites is the disruption of Bulkley Dunton's pre-existing business with Customer 9. Veritiv US does not point to any change in condition that worked to its disadvantage.[102]

---

[97] *See* D.I. 48 Ex. 9 at 10.

[98] For instance, Veritiv US could have conducted business solely with Customer 8's U.S. locations.

[99] D.I. 54 at 59.

[100] *Id.* at 60 (citing D.I. 14).

[101] D.I. 14.

[102] *See Collis*, 287 A.3d at 1221.

e. Imperial is entitled to a preliminary injunction enforcing the Noncompete as to Customers 1 and 4–9.

/s/ Morgan T. Zurn
Vice Chancellor Morgan T. Zurn